789 A.2d 607

**In re DAVID S.**

**No. 2, Sept.Term, 2001.**

Court of Appeals of Maryland.

Jan. 22, 2002.

524

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for petitioner/cross–respondent.

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for respondent/cross–petitioner.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, Judge.

This case involves a stop and frisk, governed by the teachings of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. We granted the State's Petition for Writ of Certiorari to determine whether cocaine taken from the person of David S. was seized in violation of the Fourth Amendment of the United States Constitution. In making this determination, we must decide whether the police had a reasonable basis to believe that David S. was armed,

and, if they did, whether the seizure of David S. was tantamount to an arrest requiring probable cause.

On April 28, 1999, the State's Attorney for Montgomery County filed a delinquency petition in the District Court of Maryland, Juvenile Division, alleging that David S., respondent, was delinquent in that he possessed a controlled dangerous substance with the intent to distribute. David S. filed a motion to suppress the drugs seized by the police. Following a hearing on the motion, the District Court found the search lawful and denied the motion to suppress. The parties then proceeded before the court on a "not guilty/agreed upon statement of facts." The court adjudged David S. to have committed a delinquent act within the meaning of Maryland Code § 3–801(j) of the Courts and Judicial Proceedings Article (1957, 1998 Repl.Vol., 2001 Supp.), and placed him on probation.

David S. noted a timely appeal to the Court of Special Appeals. The intermediate appellate court reversed the judgment. *In re David S.*, 135 Md.App. 363, 762 A.2d 970 (2000). Before that court, David S. argued that the police stop, frisk, and ultimate search and seizure of the contents of the black plastic bag seized from his waistband violated the Fourth Amendment and, thus, the trial court should have suppressed the fruits of the search. The court held that, although reasonable suspicion existed to justify a stop and frisk of David S. under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, "[t]o order him to the ground and place him in handcuffs, however, required probable cause, which the officer failed to demonstrate." *In re David S.*, 135 Md.App. at 369, 762 A.2d at 973. The court further held that the officer's conduct in lifting up David S.'s shirt to expose a black bag and exploring the contents of the bag exceeded the "strictly circumscribed" search permitted as a protective frisk by *Terry*. *Id.* at 369–70, 762 A.2d at 973.

The State's Petition for Writ of Certiorari presents the following question: whether the Court of Special Appeals erred in concluding that the cocaine found on the person of respondent had been seized in violation of the Fourth Amend-

ment. *See In re David S.,* 363 Md. 205, 768 A.2d 54 (2001). We also granted respondent's conditional cross-petition, which presented two questions: (1) Did the courts below err in concluding that the police had a reasonable basis to believe that respondent was armed; and (2) did the trial judge err in refusing to allow defense counsel to establish at the suppression hearing that the officer knew the object he grabbed was not a handgun as soon as he touched it. *Id.*

I.

We review the motion to suppress based upon the record of the suppression hearing, giving all favorable inferences to the State. *See Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420, 429 (2001).[1] We review findings of fact under the clearly erroneous standard, but review under a *de novo* standard whether, under those facts, there was reasonable suspicion to make a warrantless search. *Stokes v. State,* 362 Md. 407, 413–14, 765 A.2d 612, 615 (2001); *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999). We make our "own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case." *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248, 253 (1996).

On the evening of March 30, 1999, Cpl. Rich Segalman, a twelve-year veteran of the Rockville City Police Department, participated in surveillance of a house on Moore Drive. Police believed the site was an open air drug market. At about 8:00 p.m., Cpl. Segalman saw Pedro Hall, a person he believed to be a drug dealer, engage in what appeared to be a drug transaction. Cpl. Segalman radioed to other officers, who began to close in, but someone or something caused Hall to run inside the home and the other people present to disperse. Soon after, the police focused their attention on a different home located on Ashley Avenue.

At about 8:30 p.m., Cpl. Segalman observed Hall and David S. walking up Ashley Avenue. The two individuals stopped in

---

1. The facts set forth in this opinion are taken from the record of the hearing on the motion to suppress.

front of an abandoned transformer building, which had been boarded up for several months. A "no trespassing" sign was nailed to a tree about five feet from the building. David S. walked behind the building, while Hall crouched down in front of the building and looked around. A few minutes later, David S. came out from behind the building, showed an object to Hall, and then stuffed the object into the front waistband of his trousers. Cpl. Segalman, who was standing about twenty feet from Hall and David S., testified that, based on his extensive experiences with drug arrests and training in narcotics, he believed David S. had placed a handgun in his waistband.

When Hall and David S. began to walk toward Moore Drive, Cpl. Segalman radioed Officer Malko, who stopped the two individuals. Cpl. Segalman and his partner, Officer Bortillo, then arrived at the scene of the stop. Hall and David S. were standing when Cpl. Segalman arrived. Cpl. Segalman and Officer Bortillo forced Hall and David S. to lay on their stomachs on the ground and then placed handcuffs on them. In addition to the above named officers, Officer Peale was also present. The officers drew their guns on the suspects. According to the officers, Hall and David S. were very cooperative and did not struggle. Cpl. Segalman then rolled David S. over onto his back, touched the area of his waistband, and felt a hard object. Believing the object was a gun, Cpl. Segalman pulled out David S.'s tucked-in shirt and observed a black object protruding from his waistband. He then grabbed the object, removed it from David S.'s waistband, noted that it was wrapped in a black plastic bag, opened the bag, and found cocaine.[2]

## II.

It is the State's position that the stop and frisk of David S. was lawful. The State, as petitioner, argues that the Court of

---

**2.** Additional facts will be supplied as needed in the discussion of David S.'s argument that the trial court erroneously limited inquiry into the knowledge of the seizing officer. *See* Section IV.

Special Appeals misconstrued the facts and misapplied settled Fourth Amendment law in ruling that the search of David S. was unlawful. The State maintains that the stop was reasonable and that the permissible scope of a *Terry* stop and frisk was not exceeded by the officer effecting a hard or forceful take down and handcuffing David S. In conclusion, the State asserts that the officer did not exceed the permissible scope of a *Terry* frisk when he took the hard object from David S.'s waistband.

In response, David S. argues that the Court of Special Appeals correctly held that "to order him to the ground and place him in handcuffs . . . required probable cause, which [the police officers] failed to demonstrate." *In re David S.*, 135 Md.App. at 369, 762 A.2d at 973. Therefore, the absence of probable cause requires suppression of the evidence seized. He also argues that the Court of Special Appeals and the trial court erred in holding that the police had reasonable suspicion to justify an investigative stop and frisk. In his cross-petition, David S. argues that the trial court erroneously restricted his examination of Cpl. Segalman, thereby denying him the opportunity to establish that the officer exceeded the scope of a *Terry* frisk.

At the outset, it is important to note that the only question before this Court is whether the conduct of the police officers violated the Fourth Amendment of the United States Constitution. No issue of State law has been presented to us, nor has any State authority been cited as grounds to grant the suppression motion. Before this Court, as well as the lower courts, David S. argued only "that the stop, frisk, and ultimate search and seizure of the contents of the black plastic bag violated the Fourth Amendment and, thus, any fruits of the unconstitutional search must be suppressed." *In re David S.*, 135 Md.App. at 366, 762 A.2d at 971.

### III.

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, provides that "the right

of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. CONST. amend. XIV. The Fourth Amendment is not, however, a guarantee against all searches and seizures, but only those that are unreasonable. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985).

■ Over thirty years ago, in *Terry v. Ohio,* the Supreme Court held that a police officer may stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion, supported by articulable facts, that criminal activity "may be afoot." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d 889; *see also Quince v. State,* 319 Md. 430, 572 A.2d 1086 (1990). Reasonable suspicion is a less demanding standard than probable cause. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). In *Stokes v. Maryland,* 362 Md. 407, 765 A.2d 612 (2001), we observed that reasonable suspicion has been defined by the Supreme Court as follows:

> "While there is no litmus test to define the 'reasonable suspicion' standard, *see Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911, 918 (1996) (noting that it is impossible to articulate, with precision, what 'reasonable suspicion' means), it has been defined as nothing more than 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,' *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981); *see also Ornelas,* 517 U.S. at 695–96, 116 S.Ct. at 1661, 134 L.Ed.2d at 918, and as a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. *See Ornelas,* 517 U.S. at 695, 116 S.Ct. at 1661, 134 L.Ed.2d at 918."

*Id.* at 415, 765 A.2d at 616.

In evaluating the reasonableness of a *Terry* stop, the Supreme Court adopted a dual inquiry:

"Whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

*Terry,* 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d 889. The Court has since stated that the test requires balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985).

■ In addition to the authority to stop and briefly detain a person, the Supreme Court identified circumstances permitting police officers to pat-down the subject of a *Terry* stop:

"[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d 889 (citations omitted). This limited search, known in common parlance as a frisk, "is not to discover evidence, but rather to protect the police officer and bystanders from harm." *State v. Smith,* 345 Md. 460, 465, 693 A.2d 749, 751 (1997).

In the three decades following the Supreme Court's decision in *Terry,* the permissible scope of a *Terry* stop has been expanded. The United States Court of Appeals for the Seventh Circuit discussed the increasing intrusiveness of *Terry* stops as follows:

"The last decade has witnessed a multifaceted expansion of *Terry*, including the trend granting officers greater latitude in using force in order to neutralize potentially dangerous suspects during an investigatory detention. For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention."

*U.S. v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir.1994) (citations and internal quotation marks omitted). *See Aguilar v. State*, 88 Md.App. 276, 284, 594 A.2d 1167, 1171 (1991) (noting that "[t]he scope allowed for a Terry search has been expanded").

■ Despite changes in the contours of the *Terry* doctrine, it is important to recognize that there are no *per se* rules or bright lines to determine when an investigatory stop and frisk becomes an arrest and is elevated to the point that probable cause is required. *See Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575, 84 L.Ed.2d 605 (noting that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria"). In *Terry*, the Court observed that limitations on *Terry* stops and frisks must be developed in the concrete factual circumstances of individual cases. *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d 889. *See State v. Smith*, 345 Md. at 468, 693 A.2d at 753 (noting that the reasonableness of a *Terry* stop and frisk must be "assessed on a case-by-case basis").

### A. Validity of the Investigatory Stop

■ We agree with the Court of Special Appeals that the officers had reasonable suspicion to make an investigatory stop of respondent. The officer witnessed conduct that led him to suspect Hall and respondent of burglarizing, or attempting to burglarize, the abandoned transformer building. He observed Hall and respondent approach the abandoned, boarded-up building, and saw Hall crouch down in front of the building while respondent went to the rear of the building.

The officer then observed respondent come back around to the front and show something to Hall. According to the officer, Hall appeared to serve as a lookout while respondent went behind the building. These facts demonstrate that the officer had a reasonable, articulable belief, amounting to reasonable suspicion, that criminal activity was afoot. This justified a *Terry* stop of respondent.

### B. Validity of the Manner of the Investigatory Stop

■ In determining whether an investigatory stop is in actuality an arrest requiring probable cause, courts consider the "totality of the circumstances." *See Ferris v. State,* 355 Md. 356, 375, 735 A.2d 491, 501 (1999); *United States v. Patterson,* 648 F.2d 625, 632 (9th Cir.1981).

■ Under the totality of circumstances, no one factor is dispositive. *See Ferris v. State,* 355 Md. at 376, 735 A.2d at 501. For example, a police officer's pointing a gun at a suspect does not necessarily convert an investigatory stop into an arrest. *See, e.g., United States v. Alvarez,* 899 F.2d 833, 838–39 (9th Cir.1990) (holding that defendant was not under arrest when officers approached his vehicle with guns drawn and ordered him out of the car); *United States v. Taylor,* 716 F.2d 701, 708–709 (9th Cir.1983) (holding that the encounter was an investigatory stop and not an arrest when police approached suspects with drawn guns after having been warned that the suspects were dangerous). Likewise, an investigatory stop is not elevated automatically into an arrest because the officers handcuffed the suspect. *See, e.g., United States v. Bautista,* 684 F.2d 1286, 1289–90 (9th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983) (finding that, under the circumstances, placing suspect in handcuffs was justified when police believed another suspect was close by and at large). In short, an investigatory stop will not be transformed into an arrest when the officers take "reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed." *Alvarez,* 899 F.2d at 838.

In *Alvarez,* the Court of Appeals for the Ninth Circuit considered whether an investigatory stop was escalated to an arrest requiring probable cause when the defendant was forced to exit his car at gunpoint. *Id.* at 838. The court said:

"The Supreme Court has permitted limited intrusions on a suspect's liberty during a *Terry* stop to protect the officer's safety; a police officer may take reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed. In this circuit it has been held that 'the use of force does not convert the [investigatory] stop into an arrest if it occurs under circumstances justifying fears of personal safety.'"

*Id.* (citations omitted).

In *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988), this Court considered whether a forceful *Terry* stop was an unconstitutional seizure. *Id.* at 661, 537 A.2d at 244. The police conducted what is sometimes referred to as a "hard take down." They ordered the suspects to lie on the ground and pointed weapons at them. We noted that the test, one of reasonableness, "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Id.* (citing *United States v. Hensley,* 469 U.S. at 228, 105 S.Ct. at 680, 83 L.Ed.2d 604). We held that although the "nature of the subject intrusion was substantial, the brief but forceful detention of the suspects was constitutionally justified by reasonable suspicion under the circumstances." *Lee,* 311 Md. at 667, 537 A.2d at 247.

In weighing the intrusion on the suspects' liberty against the governmental interest in effective crime detection and prevention, we reasoned as follows:

"The determinative element in the balancing process here is that the police reasonably suspected that Lee and Hall were armed and dangerous.

On one side of the scales the nature of the subject intrusion was substantial. Petitioners were ordered to lie

on the ground and weapons, including shotguns, were pointed at them.

On the other side of the scale is the governmental interest in effective crime detection and crime prevention. Petitioners not only were suspected of an earlier robbery and attempted murder but also of then carrying a concealed weapon. This is buttressed by the State's interest in protecting the safety of the officers and the other persons on the basketball court, toward whom no suspicion had been directed. Further, the intrusion, though substantial in degree, was brief in duration. No more than two minutes elapsed from the time the officers moved in until petitioners were advised they were under arrest.

The police located both suspects at the place where the informant said they would be. The problem was that, to get close enough to the suspects to investigate, one or more police officers would have to have made an approach across a parking lot or tennis courts or both, or from around surrounding buildings, and go onto the outdoor basketball court. It is extremely unlikely that one or more strangers in that high crime area could saunter up to the basketball court and be considered by the suspects as potential recruits for a pick up game. Yet, if the petitioners became alarmed they might go for the pistol which was said to be in the bag a few feet from them. Consequently, Sergeant Straughan decided on a show of force to control the situation and minimize the risks. Under the circumstances that was reasonable."

*Id.* at 661–62, 537 A.2d at 244.

Important to our conclusion was the notion that the police display of weapons did not *per se* elevate a seizure to one requiring probable cause. *Id.* at 664, 537 A.2d at 245 (citing *United States v. Doffin,* 791 F.2d 118 (8th Cir.1986), *cert. denied,* 479 U.S. 861, 107 S.Ct. 210, 93 L.Ed.2d 140 (1986); *United States v. Merritt,* 695 F.2d 1263 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983); *United States v. Seni,* 662 F.2d 277 (4th Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982)).

We also noted that the ordering of the suspects to lie on the basketball court did not convert the investigative stop into a seizure requiring probable cause. *Id.* at 665–666, 537 A.2d at 246, and cases cited therein.

Judge Rodowsky, writing for the Court in *Lee,* quoted with approval from *People v. Chestnut,* 51 N.Y.2d 14, 431 N.Y.S.2d 485, 409 N.E.2d 958 (1980), *cert. denied,* 449 U.S. 1018, 101 S.Ct. 582, 66 L.Ed.2d 479 (1980), where police officers encountered a person whom they suspected of having just received a handgun used in a street robbery. The Court of Appeals of New York held that a police officer may order a defendant and his cohort to lie on the ground to conduct a stop and frisk where there is probable cause to arrest the cohort for armed robbery and reasonable suspicion that the cohort passed a weapon to defendant. *Id.* at 962. In reaching its conclusion, the court was sensitive to the competing interests of individuals to be free from interference and the obligations of law enforcement. The court said:

> "Street encounters between private citizens and law enforcement officers are inherently troublesome. This is so because two competing, yet equally compelling, considerations inevitably clash, to wit: the indisputable right of persons to be free from arbitrary interference by law enforcement officers and the nondelegable duty placed squarely on the shoulders of law enforcement officers to make the streets reasonably safe for us all. While in an ideal society the two might never clash, a quick glance through our newspapers reveals that our society is far from perfect. Thus, the judiciary is put to the task of balancing these competing considerations, so that they can reasonably coexist."

*Id.* at 960. Balancing the competing interests, the court reasoned that "by ordering the two men to lie on the ground, the police officer did no more than maintain the *status quo* until additional information could be elicited. Further, the single question posed by [one of the officers present]—'Where is the gun?'—was certainly justified in order to protect the officers' welfare." *Id.* at 962–63.

Finally, the New York court rejected the notion that drawn guns elevated the stop and frisk to an arrest. The court found that because the officers had reason to believe that one of the suspects had shortly before committed a robbery and was armed with a revolver, "they were justified in taking precautionary measures to ensure their own safety and well-being, not knowing for certain whether [either suspect] has possession of the gun." *Id.* at 961. As for forcing the suspects to the ground, the court reasoned as follows:

"It is true that defendant was ordered to lie on the ground, but it is simply inconceivable that the constitutional protection against arbitrary interference by police officers turns upon whether the detainee is positioned against a wall so that a frisk may be effectuated or ordered to lie on the ground."

*Id.* at 961.

In the case at bar, we hold that the police had reasonable suspicion, supported by articulable facts, to believe that respondent committed, or attempted to commit, a crime and that he had a gun in his waistband. Cpl. Segalman saw respondent and Hall engage in what appeared to be a burglary, and he saw respondent place a dark object, which looked like a handgun, in the front of his waistband. Therefore, the police were justified in conducting an investigatory stop of respondent and Hall.

▮▮▮ We hold that the stop was a legitimate *Terry* stop, not tantamount to an arrest. Several police officers conducted a "hard take down" of respondent. *See Lee,* 311 Md. 642, 537 A.2d 235. The officers, with their weapons drawn, forced respondent to the ground and placed him in handcuffs. This conduct was not unreasonable because the officers reasonably could have suspected that respondent posed a threat to their safety. Considering the totality of the circumstances, as they appeared to the officers at the time, in order to maintain their safety, handcuffing respondent and placing him on the ground for a brief time was reasonable and did not convert the investigatory stop into an arrest under the Fourth Amend-

ment. Although this is a severe form of intrusion, we conclude that under the circumstances, it was reasonable.

■ In *United States v. Sharpe,* the Supreme Court considered whether a person, reasonably suspected of engaging in criminal activity, may be detained for twenty minutes to enable police officers to conduct a limited investigation of the suspected criminal activity. *Sharpe,* 470 U.S. at 676–77, 105 S.Ct. at 1570, 84 L.Ed.2d 605. The Court stated that when police officers are acting in swiftly developing situations, reviewing courts should not indulge in unrealistic second-guessing of the officer. *Id.* at 686, 105 S.Ct. at 1575, 84 L.Ed.2d 605. The Supreme Court emphasized that the test is one of reasonableness:

"A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But, the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."

*Id.* at 686–87, 105 S.Ct. at 1575–76, 84 L.Ed.2d 605. The rationale is applicable to the case before us. In light of this deferential stance and the apparent reasonableness of the officers' actions, we find that the stop of respondent did not exceed the permissible bounds of a *Terry* stop.

### C.   Validity of the Frisk

Respondent argues that the trial court and the Court of Special Appeals erred in holding that, pursuant to a *Terry* frisk, the police could search beneath his tucked-in shirt. He contends that this was unreasonable because the officer conducting the search was not *certain* that the object beneath his shirt was a weapon.

■ In arguing that the police could not search underneath his shirt, respondent relies on the following facts. The

frisk began when Cpl. Segalman rolled respondent over onto his back and touched the area around respondent's waistband. Cpl. Segalman testified that, after touching the area for a second or two, he believed it was more likely that respondent was carrying a gun than drugs or the proceeds of a burglary. Cpl. Segalman said "it was a solid object, there was no softness to it, or anything, it was just very hard."

■ Respondent contends that Cpl. Segalman could not lift his shirt because the officer was not certain whether he was carrying a gun. *Terry* does not require a police officer to be *certain* that a suspect is armed in order to conduct a frisk for weapons. All that is required is a reasonable suspicion that the person is armed and dangerous. *See New Jersey v. T.L.O.,* 469 U.S. 325, 346, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985) (noting that "the requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment ....' "); *see generally* 4 WAYNE R. LA-FAVE, SEARCH AND SEIZURE, § 9.5(a), at 252 (1996) ("[A] protective search is permissible when there is reason to believe that the suspect *may be* armed and dangerous.")

Respondent relies on *State v. Smith,* 345 Md. 460, 693 A.2d 749, where we held that an officer could not lift a suspect's shirt to conduct a second pat-down after an initial frisk failed to detect any weapon-like object. We concluded that, following the pat-down, the officer had no legal basis to lift the suspect's shirt and conduct a second limited search. *Id.* at 470–71, 693 A.2d at 754.

*Smith* is distinguishable. *Smith,* and the cases relied on therein, all involved an initial pat-down that revealed nothing that might have been used as a weapon against the police officer. Here, based on Cpl. Segalman's observations, there was a substantial possibility that respondent was armed and dangerous. After frisking respondent and feeling a hard object that may have been a handgun, Cpl. Segalman had even more reason to believe respondent was carrying a gun. Given that Cpl. Segalman felt what he believed might have been a

gun, a belief consistent 'with what he had seen earlier, Cpl. Segalman was not precluded from lifting respondent's shirt.

## IV.

We turn next to respondent's cross-petition and his argument that the trial court erred in refusing to allow defense counsel to establish that Cpl. Segalman realized the object he grabbed was not a handgun as soon as he touched it. If Cpl. Segalman knew it was not a gun, the subsequent search of the bag exceeded the scope of a *Terry* frisk, and the evidence must be suppressed.

Respondent relies on the following facts. After Cpl. Segalman raised respondent's shirt, he saw part of the hidden object; it appeared to be black in color. Cpl. Segalman, thinking it was "definitely" a handgun, seized it. Defense counsel asked Cpl. Segalman whether he knew, as soon as he grabbed the object, that it was not a gun. The officer responded "correct."

The State objected on the grounds of relevancy and moved to strike the answer. The following discussion ensued:

[THE STATE]: Thank you. Your Honor, the reason as to his belief as to what the object was, once he seized it, is irrelevant. Any evidence about what it was, once he seized it, is irrelevant.

\* \* \*

The reason being, is that once, assuming that Your Honor buys the State's argument that there's reasonable, articulable suspicion, to do the first step, which is to touch it, and it's that reasonable, articulable suspicion was not dispelled, it simply existed still in time. An then he went to the next minorly (sic) intrusive step, which is to ... lift up the shirt. And then still, that reasonable, articulable suspicion exists, and it wasn't dispelled. At that point, he has a right, I'm going to argue legally, to seize it, because there was no way for him to dispel the suspicion, other than simply to take it, because handguns are dangerous.

And once he takes it into his possession, lawfully, as I'm going to argue, then he has a right to keep it, he doesn't have to give it right back to him, at any certain point. He has taken that object, and ... lawfully and at that point, it is in the police possession. And any perception that the police officer has about what it is, once he's already seized it, which is the issue here, is this a valid, forth amendment seizure? Is it relevant? It's in the police possession. It's like, it's as good as being in the inventory closet, in the police station, at this point. At the very millisecond that it's in his hand, as long as he's already lawfully seized it.

\* \* \*

[DEFENSE COUNSEL]: Well, I think, I think that the Terry progeny of cases suggests completely the contrary. And that is that the officer is required to ... confirm or dispel the suspicion that it is a weapon. And, the question is ... did he have to actually ... go to a full blown search, in order to dispel it, because that's what he did.... Well when he says he grabbed it and realized that it's a plastic bag, with something in it, he does ... he had dispelled the ... suspicion, and at that point, the question is whether or not it's reasonable to, finalize the search. The State's argument, and this is really just a question of whether or not you should, you should accept the testimony that he just gave, and that is when he touched it, he realized it was a plastic bag, and not a handgun. And that all I'm asking you to accept, and its only for the purpose of ... accepting the reasonableness of the Officer's incremental intrusion....

\* \* \*

COURT: I'm going to sustain the objection.

\* \* \*

COURT: It will be struck.

David S. attempted to establish that the police officer knew David S. did not have a gun as soon as the officer touched the bag in his waistband. This testimony was relevant because David S. was entitled to show that the police conduct exceeded

the scope of a *Terry* frisk. We hold that the trial court erred in restricting the examination of Cpl. Segalman.

■■■■■ The purpose of a *Terry* frisk is not to discover evidence of crime, but rather to protect the police officer and bystanders from harm. *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d 889. Therefore, *Terry* frisks are limited to a search for weapons that might place the officer or the public in danger. *See Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993). If during a lawful pat-down an officer feels an object which obviously is not a weapon, further patting of it is not permissible. *See id.* at 378, 113 S.Ct. at 2138–39, 124 L.Ed.2d 334 (noting that an officer's continued exploration of a suspect's pocket after having concluded that it contained no weapon was unrelated to "the sole justification of the search [under *Terry:*] . . . the protection of the police officer and others nearby. It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize . . . ."); *see generally* 4 WAYNE R. LA FAVE, SEARCH AND SEIZURE, § 9.5(b), at 275 (1996). The Supreme Court has made clear that "if the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373, 113 S.Ct. at 2136, 124 L.Ed.2d 334. On the other hand, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375, 113 S.Ct. at 2137, 124 L.Ed.2d 334. The rationale is that if an officer is legitimately conducting a *Terry* frisk, no additional privacy interest is implicated by the seizure of an item whose identity is already plainly known through the officer's sense of touch. *Id.* at 377, 113 S.Ct. at 2138, 124 L.Ed.2d 334.

In *State v. Smith*, 345 Md. 460, 693 A.2d 749 (1997), we addressed the contours of a *Terry* frisk. We observed as follows:

"[T]he objective is to discover weapons readily available to a suspect that may be used against the officer, not to ferret out carefully concealed items that could not be accessed without some difficulty. General exploratory searches are not permitted, and police officers must distinguish between the need to protect themselves and the desire to uncover incriminating evidence."

*Id.* at 465, 693 A.2d at 751 (citations omitted). Therefore, if the officer in the case before us realized that the bag in respondent's waistband was not a weapon, the search of respondent's property exceeded the permissible scope of a *Terry* frisk and the evidence should be suppressed.

The State argues that once Cpl. Segalman removed the bag and believed it to be a package containing drugs, the officer could seize it under the plain view doctrine. On the record before us, the plain view doctrine is not satisfied. The plain view doctrine of the Fourth Amendment requires that: (1) the police officer's initial intrusion must be lawful or the officer must otherwise properly be in a position from which he or she can view a particular area; (2) the incriminating character of the evidence must be "immediately apparent;" and (3) the officer must have a lawful right of access to the object itself. *Wengert v. State,* 364 Md. 76, 88–89, 771 A.2d 389, 396 (2001). We observed in *Wengert* that "[t]he requirement that an object's incriminating nature be 'immediately apparent' ensures that the 'plain view' doctrine is not used to engage in 'a general exploratory search from one object to another until something incriminating at last emerges.'" *Id.* at 89, 771 A.2d at 397 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). Construing the term "immediately apparent," we said:

" 'Immediately apparent,' however, does not mean that the officer must be nearly certain as to the criminal nature of the item. Instead, 'immediately apparent' means that an officer must have probable cause to associate the object with criminal activity."

*Wengert,* 364 Md. at 89, 771 A.2d at 397 (citations omitted). *See State v. Wilson,* 279 Md. 189, 195, 367 A.2d 1223, 1227 (1977) (prohibiting use of any evidence seized outside the warrant unless it is "immediately apparent to the police that they have evidence of crime before them").

The record before us is devoid of any evidence to support a finding that it was immediately apparent to the officer that the bag contained drugs. Accordingly, we hold that the trial court erred in restricting defense counsel's examination of Cpl. Segalman during the motion to suppress.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.*

Chief Judge BELL and Judge ELDRIDGE concur in the result and in Part IV of the Court's opinion. They do not concur in the remainder of the Court's opinion.