870 A.2d 1228

**James Nathaniel SMITH**

v.

**STATE of Maryland.**

**No. 2371, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

April 1, 2005.

Douglas J. Wood, Riverdale, for appellant.

Annabelle L. Lisic (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel KENNEY, ADKINS, CHARLES E. MOYLAN, JR. (Retired specially assigned) JJ.

KENNEY, J.

James Nathaniel Smith, appellant, was convicted after a bench trial in the Circuit Court for Prince George's County of possession with intent to distribute greater than fifty grams of crack cocaine and possession of a firearm with nexus to drug trafficking. He was sentenced to ten years for the drug possession charge, with all but five years suspended, and five years for the possession of a firearm charge, with the sentences to be served concurrently. On appeal, Smith poses the following question, which we have slightly reworded:

Did the circuit court err in denying his motion to suppress evidence obtained in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution?

Because we find that Smith's rights were not violated, we affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

On May 2, 2003, Detective Anthony Weaver was assigned to the Narcotics Enforcement Division of the Prince George's County Police Department. In a telephone conversation, a confidential source revealed to Detective Weaver that a man named "Jimmy" was present in the vicinity of Emo Street in Prince George's County for the purpose of distributing crack cocaine. The informant described "Jimmy" as "a black male, thin build, corn rows, light beard, with a black T-shirt ... driving a grayish-black Jeep Cherokee with tinted windows."

In response to the informant's tip, Detective Weaver and Sergeant Edward Davey,[1] traveling in separate cars, ventured to the Emo Street and Clovis Avenue neighborhood. They arrived there at approximately 7:30 p.m. Shortly thereafter, the officers located a gray Jeep Cherokee in the eight or nine hundred block of Clovis Avenue. It had tinted windows and was facing the direction indicated by the informant. Surveilling the Jeep and the area, the officers witnessed a man matching the description given by the informant exit the vehicle several times, approach a group of males across the street, and then reenter the driver's seat of the vehicle. Both Detective Weaver and Sergeant Davey later identified the man as James Smith. Detective Weaver met with uniformed patrol officers on a nearby street for the purpose of instructing them to stop the vehicle when it was driven away. Sergeant Davey remained to watch the Jeep.

---

1. Subsequently, Davey was promoted from Sergeant to Lieutenant. We refer to him as Sergeant Davey in this opinion.

When Smith drove away, he was quickly stopped and surrounded by three marked Prince George's County police vehicles in the middle of Balboa Avenue. Officer Gurry, the uniformed officer conducting the stop, ordered Smith to exit the vehicle. Smith was escorted away from the Jeep. Two passengers, William Frazier and Andre Taylor, were then ordered to exit the Jeep and were escorted off to the side.

Detective Weaver and Sergeant Davey both arrived on the scene shortly after the stop. Sergeant Davey had Maggs with him, a police canine trained to detect the odors of marijuana and crack cocaine, among other illicit drugs. He then conducted an exterior canine scan of the vehicle. While passing the rear driver's side of the Jeep, Maggs jerked her head, indicating to Sergeant Davey that she had detected an odor she was trained to recognize.

When Maggs was placed in the interior of the Jeep, she immediately went to the center console. After being prompted to search the back seat, Maggs returned to the center console and began scratching it. Sergeant Davey testified that Maggs had been trained to scratch at an area where she discovers the strongest scent of an odor that she had been trained to detect. Sergeant Davey informed Detective Weaver concerning the alerts Maggs had given.

Based on that information, Detective Weaver began a search of the Jeep's interior. An electronic scale with suspected cocaine residue on its top and sides was found in the glove compartment. In addition, some hollowed out "backwoods cigars" were found in the center console and some plastic bags were found on the rear seat. Following the initial search of the Jeep, Smith was placed under arrest. He was searched incident to arrest and $1,573 and some suspected marijuana were found.

According to the testimony of Detective Weaver and Sergeant Davey, after Smith's arrest, the continued search of the Jeep was interrupted several times due to increased traffic on Balboa Avenue. Although Balboa Avenue was a two lane road, vehicles were parked on both sides of the road making it

impossible for two vehicles traveling in opposite directions to pass. Determining that a continued search of the Jeep at that location was too dangerous, the officers impounded the Jeep and towed it to the District IV precinct.

Upon the arrival of the Jeep at the precinct, Sergeant Davey again walked Maggs around the outside of the Jeep. According to Sergeant Davey, Maggs alerted to the same spot near the driver's side rear tire. Moreover, a continued search of the interior of the vehicle revealed what Sergeant Davey considered to be an overabundance of air fresheners and electrical wires. As a result of his suspicion that the wires controlled access to a secret compartment, Sergeant Davey called in the "fire board" or fire department. The fire department located a secret compartment in the rear of the vehicle and used tools to open it. Inside the compartment were two handguns, a Beretta and a Glock, some money, and what appeared to be bags of crack cocaine totaling more than fifty grams. Cellular phones were recovered from the Jeep's interior.

On May 27, 2003, the Grand Jury for Prince George's County indicted Smith for: 1) possession with intent to distribute greater than fifty grams of crack cocaine; 2) possession of cocaine, a controlled dangerous substance, with intent to distribute; 3) possession of cocaine, a controlled dangerous substance; 4) possession of marijuana, a controlled dangerous substance; 5) possession of drug paraphernalia; 6) possession of a firearm, Beretta, with nexus to drug trafficking; and 7) possession of a firearm, Glock, with nexus to drug trafficking.

### The Suppression Hearing

Smith moved to suppress the evidence obtained from the search incident to his arrest and from the search of the Jeep, alleging that the officers violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution. A hearing was held on August 29, 2003.

Detective Weaver was the first witness called by the State. He testified that, on May 2, 2003, he received a phone call

from a confidential informant regarding Smith. According to Detective Weaver, the informant told him that a black male named "Jimmy" was on Emo Street for the purpose of distributing crack cocaine. The informant described Jimmy as "a black male, thin build, corn rows, light beard, with a black T-shirt. He also said that he would be driving a grayish-black Jeep Cherokee." After he and Sergeant Davey had gone to the area around Emo Street and Clovis Avenue, Detective Weaver was again contacted by the informant, who reiterated his prior description.

Detective Weaver recalled that the same confidential informant had once before provided information, which was relied on to obtain a search warrant and effectuate an arrest. Furthermore, he stated that none of the information provided by the confidential informant had been proven incorrect or inaccurate.

He then testified as to the eventual location of the Jeep matching the informant's description and the subsequent surveillance. According to Detective Weaver, a group of men were surrounding the Jeep and a man matching the informant's description exited and reentered the Jeep several times. On one occasion, a man approached the driver's side window of the Jeep, but Detective Weaver was too far away to determine what was occurring. He stated that he did not witness anything that he "could verify as a drug transaction." Detective Weaver left the area to instruct uniformed patrol units to stop the vehicle.

Although he was not present when the Jeep was stopped, Detective Weaver arrived on the scene shortly afterward, and he was informed by Officer Gurry, the officer conducting the stop, that the three occupants of the Jeep were "extremely nervous." Officer Gurry ordered all of the occupants out of the Jeep. Sergeant Davey then conducted the canine scan and informed Detective Weaver that Maggs had alerted.

Detective Weaver then searched the car. He found an electronic scale in the glove compartment, some cigars in the console, and some plastic bags in the back seat. He did not

remember whether he performed a field test, but Detective Weaver testified that there was suspected cocaine residue on the top and sides of the scale. According to Detective Weaver, after the scale was found, Smith was placed under arrest. A search incident to Smith's arrest revealed $1,573 and a small quantity of suspected marijuana.

Detective Weaver testified that, following Smith's arrest, Balboa Avenue became crowded with traffic. Because it was a "very narrow" street, when traffic passed, the continued search of the Jeep had become unsafe and had to be halted. The Jeep was towed to the District IV precinct.

When the Jeep arrived at the precinct, Detective Weaver observed Sergeant Davey conduct a second exterior canine scan. Sergeant Davey informed him that Maggs had alerted to the same location. While the search of the Jeep continued outside, Detective Weaver went into the station house to begin preparing paperwork.

During cross-examination, Detective Weaver stated that he did not remember taking notes on his phone conversations with the informant. He also did not remember whether the informant had provided him a license plate number, but he acknowledged that a tag number was not included in his report describing the information provided by the informant. Whether the informant had given a clothing description was also missing from the report. Furthermore, Detective Weaver testified that the informant had in the past been a drug user and dealer. Although the informant was not paid money for his prior tip, Detective Weaver stated that he was paid $600 for the information resulting in Smith's arrest. Detective Weaver did see Smith exit and leave the Jeep, but he did not witness Smith engage in behavior that he could identify as a drug transaction.

Detective Weaver testified that he did not recall the method Officer Gurry used to get Smith out of the Jeep after it had been stopped, but he stated that not much force was used. He also stated that, after Smith got out of the Jeep, Officer Gurry patted Smith down, but that Officer Gurry did not

handcuff Smith until the scale, baggies, and cigars were found in the Jeep.

The State's next witness was Sergeant Davey. After identifying Smith, Sergeant Davey testified that he, along with Detective Weaver, traveled to Clovis Avenue because of the tip received from the informant. After locating the Jeep, Sergeant Davey observed Smith going to and from the vehicle several times. He watched the Jeep until Smith drove away.

Although he was not present when Smith was stopped, Sergeant Davey arrived on the scene shortly afterward. He stated that he had been the handler of Maggs, a dog trained in detecting drug odors since November 1999. He and Maggs had attended the United States Customs Training Academy for three months training the dog to detect, among other drugs, marijuana and cocaine. He and Maggs were also certified by United States Customs in the detection of crack cocaine.

According to Sergeant Davey, following the removal of all of the Jeep's occupants, he retrieved Maggs from his vehicle and did an exterior scan of the Jeep. Passing the driver's side rear tire, Maggs jerked her head to the side, which indicated to Sergeant Davey that Maggs had detected the presence of an odor that she had been trained to detect. Following the exterior scan, Sergeant Davey conducted an interior canine scan. During the interior scan, Maggs began scratching at the center console, which was what Maggs had been trained to do when she located the strongest scent of an odor she had been trained to detect.

As a result of Maggs's indications, the initial search of the Jeep was performed. Although they found an electronic scale with what appeared to be cocaine residue and wished to continue searching the Jeep, Detective Davey testified that traffic on Balboa Avenue made a continued search of the Jeep unsafe. Consequently, the Jeep was towed to the District IV Precinct in order to continue the search in a more conducive environment.

When the Jeep arrived at the precinct, Detective Davey testified that he continued the search of the Jeep. An overabundance of electrical wires indicated to him that the Jeep likely had a hidden compartment. After locating the hidden compartment and having the fire department open it, Sergeant Davey stated that they recovered the guns, currency, and crack cocaine.

During cross-examination, Sergeant Davey stated that while watching the Jeep on Clovis Avenue, he saw Smith exit the Jeep several times, cross the street to where several males had congregated, and then return to the Jeep. He could not verify any activity as a drug transaction.

Recalling Maggs's interior search of the Jeep, Sergeant Davey stated that the scale was found in the Jeep's glove compartment. Although Maggs would have been able to detect odors from the glove compartment, she did not alert to it. Furthermore, when questioned about whether he performed a field test on the scale, he stated that he did not remember, but he believed a field test was performed.

Smith called William Frazier. Frazier testified that he was friends with Smith and that he was in Smith's gray Jeep Cherokee on May 2, 2003. According to Frazier, he was occupying the passenger seat, Smith was driving, and Andre Taylor was riding in the back seat. As the Jeep arrived at Taylor's house on Balboa Avenue, Frazier remembered that he heard an officer exclaim, "Get back in the car." He also testified that a uniformed officer approached the Jeep with his gun drawn. Afterward, Frazier testified that the officer demanded Smith's license and registration and then ordered him out of the Jeep. Immediately thereafter, Frazier testified that Smith was escorted to the back of the Jeep and placed in handcuffs.

He and Taylor were ordered out of the vehicle and seated on the ground. After the dog searched the Jeep, Frazier stated that Smith was taken to an unmarked police car and driven away.

After hearing arguments from both parties, the circuit court determined that the informant's tip was sufficient to justify an investigative stop and the search of Smith was a valid search incident to arrest. The circuit court also found that the search of the Jeep was valid under the *Carroll* Doctrine.

Following the suppression hearing, on September 28, 2003, Smith appeared before the circuit court and pleaded not guilty on an agreed statement of facts. He was found guilty of possession with intent to distribute greater than fifty grams of crack cocaine and guilty of possession of a firearm with a nexus to drugs trafficking. This timely appeal followed.

## STANDARD OF REVIEW

When reviewing a denial of a motion to suppress under Maryland Rule 4–252, we are required to make an independent review of the legal questions presented at the suppression hearing by applying the law to the facts. *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002). We are limited to the record adduced at the suppression hearing. *State v. Carroll*, 383 Md. 438, 445, 859 A.2d 1138 (2004); *Rowe v. State*, 363 Md. 424, 431, 769 A.2d 879 (2001); *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999). We view the evidence in a light most favorable to the State as the prevailing party. *Ferris*, 355 Md. at 368, 735 A.2d 491; *Graham v. State*, 146 Md.App. 327, 341, 807 A.2d 75 (2002). The trial court's factual findings are accepted unless clearly erroneous, as are the trial court's conclusions regarding witness credibility. *Dashiell v. State*, 374 Md. 85, 93, 821 A.2d 372 (2003); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990).

## DISCUSSION

Smith asserts that the circuit court erred in not suppressing the evidence seized from the search incident to his arrest and the search of the Jeep because both searches violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free of unreasonable searches and seizures. He claims that he was subjected to a custodial

arrest without the police first having attained probable cause. According to Smith, it was during his unlawful custodial arrest that the police conducted a canine scan of the Jeep, and as a result, any evidence obtained in subsequent searches was fruit of the poisonous tree.

Smith maintains that the facts of the instant case are indistinguishable from *Dixon v. State,* 133 Md.App. 654, 758 A.2d 1063 (2000). In *Dixon,* an officer with the Montgomery County Police Department received a phone call from a confidential informant. *Id.* at 658, 758 A.2d 1063. During the conversation, the informant disclosed that "a black male named Orville Dixon would be transporting approximately ten pounds of marijuana to the second level of a parking garage adjacent to the Nordstrom's department store at the Montgomery Mall." *Id.* at 659, 758 A.2d 1063. Additionally, the informant stated that Dixon would arrive in a dark-colored Acura at approximately 8:15 p.m. for the purpose of conducting a drug sale. *Id.* As a result of the tip, the police went to the parking garage. *Id.* When they arrived, the Acura was already present. A check of its tag number revealed that it was owned by Dixon. *Id.* at 660, 758 A.2d 1063. At approximately 8:15 p.m., Dixon emerged from a stairwell, looked around the vicinity of the car, and then returned to the stairwell. *Id.* A few minutes later, Dixon entered the parking lot, walked over to the car, unlocked the door, and got into the driver's seat. *Id.*

Several unmarked police cars immediately surrounded the car. *Id.* Dixon was removed from the car and handcuffed. *Id.* Although the officer did not view any contraband in the passenger compartment, when the officer opened the trunk of the car, he detected a strong odor of marijuana and found approximately nine gallon-sized bags filled with marijuana. *Id.*

At a suppression hearing, the Circuit Court for Montgomery County determined that there was sufficient probable cause for the police to conduct a search of the vehicle. *Id.* at 666–67, 758 A.2d 1063. Moreover, the motion court found that Dixon

had not been subject to an arrest until after the search of the trunk, even though he had been placed in handcuffs prior to the opening of the trunk. *Id.* at 666, 758 A.2d 1063. Therefore, according to the circuit court, Dixon's arrest was proper and the marijuana evidence was admissible. *Id.* at 666–67, 758 A.2d 1063.

On appeal, this Court held, initially, that Dixon had clearly been arrested prior to the search of the trunk. *Id.* at 673, 758 A.2d 1063. We acknowledged, however, that whether Dixon had been arrested or merely detained was not particularly relevant because "the warrantless search of the trunk could only be supported by probable cause." *Id.* at 669, 758 A.2d 1063. Accordingly, the primary issue in *Dixon* was whether the informant's tip was sufficient to equip the police with probable cause to search the Acura. *Id.* After an extensive review of case law discussing automobile searches and the factors concerning when an informant's tip may provide probable cause, we held that the informant's tip in that case, standing alone, was not sufficient to provide probable cause for a vehicle search under *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and its progeny. *Id.* at 695–96, 758 A.2d 1063. In so holding, we stated that the tip was "sorely lacking in meaningful detail," that the "police did not testify to any significant corroboration of the tip," and that "the confidential informant's tip was woefully undeveloped." *Id.* at 696, 758 A.2d 1063.

 Smith's reliance on *Dixon* is misplaced. Contrary to his contention, and unlike the facts in *Dixon,* Smith was not arrested until after the police conducted a canine scan of the vehicle and after a search revealed an electronic scale containing suspected cocaine residue. Nevertheless, Smith was seized within the meaning of the Fourth Amendment. It is well settled that a seizure takes place "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446

U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). In the present case, viewing all of the circumstances surrounding the stop, including Smith's Jeep being surrounded by at least three marked police cars, a reasonable person in Smith's position would not believe that he was free to leave. Therefore, our inquiry turns to whether the seizure was reasonable, and thus permitted under the Fourth Amendment.

Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, police may conduct an investigative stop provided that they have "specific and articulable facts, which taken together with the inferences from those facts," create a reasonable articulable suspicion for suspecting legal wrongdoing. *Id.* at 21, 88 S.Ct. 1868. "A *Terry* [or investigative] stop is distinguishable from an arrest in three important respects: the length of the detention, the investigative activities that occur during the detention, and the question of whether the suspect is removed from the place of the stop to another location." *Johnson v. State*, 154 Md.App. 286, 297, 839 A.2d 769 (2003). Whether the police had a reasonable articulable suspicion prior to the investigatory stop is to be considered in light of the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Whether an investigatory stop is in actuality an arrest or escalates into one is also to be determined under the totality of the circumstances. *Johnson*, 154 Md.App. at 297, 839 A.2d 769 (quoting *In re David S.*, 367 Md. 523, 535, 789 A.2d 607 (2002)).

It is well settled that an informant's tip may be sufficient to support an investigative stop. *Adams v. Williams*, 407 U.S. 143, 147–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). *See also Alabama v. White*, 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (Under certain circumstances, even an anonymous tip may be sufficient to justify an investigatory stop). Before an informant's tip can give rise to an articulable suspicion sufficient to support an investigatory stop, the tip must show some indicia of reliability. *Adams*, 407 U.S. at 147–48, 92 S.Ct. 1921; *Millwood v. State*, 72 Md.App.

82, 93, 527 A.2d 803 (1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

▉▉▉ In the instant case, Detective Weaver testified that the informant had previously provided him with information that was used in obtaining a warrant and effectuating an arrest. In addition, the informant had never before provided him with information that turned out to be incorrect. As the Supreme Court has opined, the indicia of reliability surrounding an informant's tip are greater where the informant is known because the informer may be subject to immediate repercussions for providing false information. *Adams,* 407 U.S. at 147, 92 S.Ct. 1921.

The informer described Smith with particularity; Jimmy, a nickname for James, was "a black male, thin build, corn rows, light beard, with black T-shirt ... driving a grayish-black Jeep Cherokee with tinted windows." He also described Smith's general location and approximately when he would be there.

When the officers arrived, they observed all of the information provided by the informant, and, through their own observations, they gained additional information. Although the surveilling officers did not witness any activity that they could "verify as a drug transaction," they witnessed Smith exit the vehicle several times, approach a group of males across the street, and return to the vehicle. Detective Weaver also witnessed a man approach the driver's side window of the Jeep.

Given the past reliability of the informant, the accuracy of the information given, and the officers' independent observations, we are persuaded that the officers had a reasonable articulable suspicion that Smith was committing a crime. Because the officers had a reasonable articulable suspicion that Smith might be in possession of, and in the process of distributing illicit drugs, the officers did not violate his Fourth Amendment rights when they conducted the investigatory stop.

We next consider whether the officers exceeded the permissible scope of the investigatory stop. When Smith was stopped, he was ordered out of the Jeep, patted down, escorted to the rear side of the car, and seated on the ground.[2] The other occupants of the Jeep were then ordered out and also seated off to the side. Although the informant did not specifically mention that Smith would be carrying a gun, given that Smith was suspected of dealing narcotics, it was not unreasonable for the officers to assume that he was armed.

In *Lee v. State*, 311 Md. 642, 537 A.2d 235 (1988), the Court of Appeals found that the circumstances of an investigatory stop may necessitate an officer drawing his or her service weapon in order to assure the safety of the officers conducting the stop. *Id.* at 663, 537 A.2d 235. In doing so, the Court quoted the following passage from *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981):

Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Lee*, 311 Md. at 663–64, 537 A.2d 235.

The stop in this case presented similar risks. Thus, we conclude that the officers acted prudently in order-

---

2. Frazier testified that Smith was placed in handcuffs immediately after exiting the Jeep and that the officer conducting the stop approached the Jeep with his service weapon drawn. The trial court did not specifically remark on credibility or make a finding as to when Smith was arrested, but we view the evidence in the light most favorable to the State as the prevailing party. The only other evidence adduced, from witnesses for both sides, regarding the stop was that Smith was told to exit the vehicle, was moved to the back of the vehicle, and seated off to the side. Standing alone, the mere fact that an officer displays his service weapon during the course of an investigatory stop does not elevate the seizure into one requiring probable cause. *Lee v. State*, 311 Md. 642, 664, 537 A.2d 235 (1988) (citing *United States v. Doffin*, 791 F.2d 118 (8th Cir.1986); *United States v. Merritt*, 695 F.2d 1263 (10th Cir.1982)).

ing Smith and the other occupants of the vehicle out in order to limit any potential threat to the safety of the officers conducting the investigatory stop. Additionally, it is well settled that, when an officer has reason to believe that a suspect is armed during an investigatory stop, the officer may pat down or frisk the suspect to assure the suspect is unarmed. *See Terry*, 88 S.Ct. at 1872, 1879.

■ After the Jeep's occupants were ordered out, Sergeant Davey and Maggs conducted an exterior canine scan of the vehicle.[3] As a canine scan to the exterior of a vehicle does not constitute a search within the meaning of the Fourth Amendment, such an investigative technique is clearly within the permissible scope of a *Terry* stop. *See In re Montrail M.*, 87 Md.App. 420, 436, 589 A.2d 1318 (1991) ("Unless the factual scenario includes some additional element, a canine scan conducted contemporaneously with a detention that passes Fourth Amendment muster does not further implicate the Fourth Amendment."). *See also Illinois v. Caballes*, — U.S. ——, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005) (holding that no reasonable articulable suspicion was required for a canine scan conducted during a legitimate traffic stop because "[a]ny intrusion on [stopee's] privacy expectations does not rise to the level of a constitutionally cognizable infringement."); *City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (quoting *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)) ("[A]n exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence of absence of narcotics. Like the dog sniff in *Place*, a sniff by a dog is 'much less intrusive than a typical

---

**3.** The record does not specifically indicate the duration of time between when the occupants were ordered out of the Jeep and when Sergeant Davey conducted the first canine scan. Sergeant Davey, however, testified that he circled the block after the vehicle initially went mobile. He arrived at the scene of the stop with Maggs while all of the occupants remained in the Jeep and conducted the initial scan soon after the Jeep's occupants were removed.

search.' "); *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001); *Gadson v. State,* 341 Md. 1, 8, 668 A.2d 22 n. 4 (1995).

 Once Maggs, a canine certified to detect narcotics alerted to the Jeep, the officers had probable cause to conduct a warrantless search of the Jeep, including the interior canine scan. *See State v. Wallace,* 372 Md. 137, 146, 812 A.2d 291 (2002), *cert. denied,* 540 U.S. 1140, 124 S.Ct. 1036, 157 L.Ed.2d 951 (2004)("[T]he law is settled that when a properly trained canine alerts to a vehicle indicating the likelihood of contraband, sufficient probable cause exists to conduct a warrantless *'Carroll'* search of the vehicle."); *State v. Funkhouser,* 140 Md.App. 696, 711, 782 A.2d 387 (2001) ("When a qualified police dog signals to its handler that narcotics are in a vehicle ... that is *ipso facto* probable cause to justify a *Carroll* Doctrine warrantless search of the vehicle.").

 Upon conducting the search of the vehicle and finding the scale with suspected cocaine residue in the glove compartment, the officers obtained probable cause to arrest Smith. *Conboy v. State,* 155 Md.App. 353, 364, 843 A.2d 216 (2004) (citing *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). The police were then permitted to conduct a search of Smith incident to his arrest. *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (stating that once the police make a lawful arrest, they are permitted to search "the person of the arrestee" and "the area within the control of the arrestee" to remove any weapons or evidence that the arrestee could conceal or destroy).

 We also are not persuaded that the towing of the Jeep back to the District IV precinct to continue the search of the vehicle violated Smith's constitutional rights. The Jeep was towed in order to protect the safety of the officers and to allow traffic on Balboa Avenue to pass unobstructed. In *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court considered "the admissibility of evidence seized from an automobile, in which petitioner was riding at the time of his arrest, after the automobile was taken

to a police station and was there thoroughly searched without a warrant." *Id.* at 43, 90 S.Ct. 1975. In that case, the Court noted that the removal of the vehicle from the scene of arrest to the station house was "not unreasonable" because "[a] careful search at [the scene of arrest] was impractical and perhaps not safe for the officers...." *Id.* at 52 n. 10, 90 S.Ct. 1975. The *Chambers* Court held that once the police obtained probable cause and could permissibly search the vehicle under the *Carroll* doctrine at the scene of the arrest, the probable cause factor "still obtained at the station house" after the vehicle was towed, and it was constitutionally permissible to continue the search without a warrant. *Id. See also Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *Mobley v. State,* 270 Md. 76, 310 A.2d 803 (1973) (continued *Carroll* search of vehicle permitted after vehicle removed to police station); *Hutchinson v. State,* 38 Md.App. 160, 380 A.2d 232 (1977) (warrantless vehicle search permitted at county impound lot).

We find *Carter v. State,* 143 Md.App. 670, 795 A.2d 790 (2002), instructive. In that case, officers with the Howard County Police Department received an anonymous phone call indicating that a van was present at a school on a Sunday evening and was being frequented by youths. *Id.* at 679, 795 A.2d 790. Suspecting that the van's occupants were selling drugs, the police arrived several minutes later. *Id.* at 681, 795 A.2d 790. Upon doing so, the police witnessed two individuals walking away from the van. *Id.* As the patrol car neared, the individuals began running away, and the occupants of the van attempted to drive out of the parking lot. *Id.* After speaking with the two occupants of the van, the officers suspected that they were dealing drugs. *Id.* The responding officers then detained the van and its occupants for approximately twenty-five minutes until a canine could be brought to the scene. *Id.* at 696, 795 A.2d 790. Performing a scan of the vehicle, the canine alerted to the handler that drugs were present. *Id.* at 698, 795 A.2d 790. A subsequent search of the vehicle uncovered marijuana. *Id.*

The defendant moved to suppress the evidence obtained from the search of the van, asserting that it violated his Fourth Amendment rights. *Id.* at 673, 795 A.2d 790. The Circuit Court for Howard County denied the motion. *Id.* On appeal, this Court affirmed the judgment of the circuit court. *Id.* With regard to an investigative *Terry*-stop, we explained that

> a stopee's freedom of movement is most definitely restricted under the command of law. If he attempts to leave after being ordered, perhaps at gunpoint, to stop, he may be shot or otherwise forcibly restrained. Such consequences, notwithstanding the appellant's urging to the contrary, do not *ipso facto* transform a *Terry*-stop into an arrest.

*Id.* at 677, 795 A.2d 790.

Moreover, this Court found that the totality of the circumstances provided the officers with a reasonable articulable suspicion that the occupants of the van were dealing drugs. *Id.* at 688, 795 A.2d 790. We also found that the twenty-five minute delay prior to the drug-sniffing canine was not outside of the temporal limits of a *Terry*-stop. *Id.* at 697–98, 795 A.2d 790. Because the dog alert gave the officers probable cause to search the van and the detection of drugs gave the officer probable cause to arrest the occupants, we concluded that the circuit court did not err in denying the defendant's motion to suppress. *Id.* at 698, 795 A.2d 790.

We are not persuaded that the pertinent facts of the instant case are distinguishable from *Carter.* Accordingly, for the reasons stated above, we hold that the circuit court did not err in denying Smith's motion to suppress the evidence seized as a result of the search of the Jeep or incident to his arrest.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**