839 A.2d 769

**Ricardo I. JOHNSON**

v.

**STATE of Maryland.**

**No. 1460, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Dec. 22, 2003.

Jason A. Lyons, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for Appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and CHARLES E. MOYLAN, JR. (Ret'd, specially assigned), and JAMES S. GETTY, (Ret'd, specially assigned), JJ.

MURPHY, Chief Judge.

In the Circuit Court for Baltimore County, the Honorable John O. Hennegan convicted Ricardo I. Johnson, appellant, of (1) distribution of cocaine, (2) use of a firearm in relation to drug trafficking, and (3) unlawful wearing, carrying, or transporting of a handgun.[1] Appellant now argues that (1) the State should not have been permitted to introduce into evidence the incriminating tangible items seized from his person, (2) the State's evidence was insufficient to establish his guilt of the "use ... in relation" offense, and (3) he should not have received separate sentences for the "firearm" and "handgun" convictions. These arguments present three separate questions for our review:

**I. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS THE DRUGS AND THE HANDGUN SEIZED FROM APPELLANT'S PERSON SUBSEQUENT TO HIS ARREST?**

**II. WAS THE EVIDENCE INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR USE OF A FIREARM IN RELATION TO DRUG TRAFFICKING?**

---

1. After Judge Hennegan denied the pretrial motion to suppress the items seized from appellant's person, the trial on the merits proceeded on a "not guilty statement of facts" that included the suppression hearing testimony.

## III. DOES APPELLANT'S TWO–YEAR CONCUR-RENT SENTENCE FOR UNLAWFUL WEARING, CARRYING, OR TRANSPORTING OF A HAND-GUN MERGE INTO HIS FIVE–YEAR SEN-TENCE FOR USE OF A FIREARM IN RELA-TION TO DRUG TRAFFICKING?

For the reasons that follow, we answer "no" to each question, and shall therefore affirm the judgments of the circuit court.

### Factual Background

 Prior to trial, appellant's counsel filed a motion to suppress the drugs and handgun seized from appellant's person subsequent to his arrest. Judge Hennegan was entitled to accept all, part, or none of the following suppression hearing testimony.[2] On February 28, 2001, several members of the Baltimore County Police Department conducted an investigation that resulted in appellant's arrest. The investigators included Detective Allan Griffin, Corporal Steve Sunderland and Sergeant James Conaboy. During the investigation, they communicated with one another over police radios.

The investigation began with a surveillance of pay phones located near the Crown gas station at the intersection of

---

**2.** In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and do not consider the record of the trial. *Trusty v. State,* 308 Md. 658, 670–71, 521 A.2d 749 (1987)(quoting *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied,* 294 Md. 652 (1982)); *see also Carter v. State,* 367 Md. 447, 457, 788 A.2d 646 (2002); *Watkins v. State,* 90 Md.App. 437, 439, 601 A.2d 1115, *cert. denied,* 327 Md. 80, 607 A.2d 921 (1992). We are further limited to considering only those facts that are most favorable to the State as the prevailing party on the motion. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *see also Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22 (1990).

In considering the evidence presented at the suppression hearing, we extend great deference to the fact finding of the suppression hearing judge with respect to the weighing and determining of first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). As to the ultimate concluding fact of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Perkins,* 83 Md.App. at 346, 574 A.2d 356.

Liberty and Brenbrook roads. The officers knew that these phones were occasionally used by persons involved in drug transactions. At approximately 6:40 p.m., Detective Griffin observed a dark-colored Chevrolet pickup truck pull up to a gas pump at the station. One white male got out of the truck, walked up to one of the pay phones, dialed a number, promptly hung up the receiver, and waited by the phone. Based on his knowledge, training, and experience, Detective Griffin recognized this call as a call to a pager, which is a common method of contacting a drug dealer.

Shortly thereafter, the white male received a call on that phone. He spoke for approximately one minute, hung up, and walked back to the truck. He then drove out of the gas station and traveled in a westerly direction on Liberty Road. Detective Griffin followed the truck, which came to a stop on the parking lot outside of Tom's Sports Bar. At this point, two persons got out of the truck and walked into the bar. Detective Griffin, along with other members of the police department, maintained surveillance of the area.

Approximately five minutes after the truck stopped in front of the bar, Corporal Sunderland observed a red Chevrolet Beretta pull onto the parking lot and park next to the truck. At this point, appellant got out of the Beretta, opened the hood of that vehicle, and stood near it for about one minute. During this time period, appellant appeared to be looking around to see if anyone was looking at him. Appellant then opened the door of the Chevrolet truck, bent down, closed the door, walked back to the Beretta, and drove away. Some of the officers followed appellant's vehicle.

After appellant drove away from Tom's Sports Bar, Corporal Sunderland observed the two occupants of the pickup truck come out of the bar and walk toward the truck. Corporal Sunderland approached the two individuals, looked inside the driver's side window of the truck, and observed a small bag of what appeared to be crack cocaine on the floor of the vehicle. He then placed the two individuals under arrest and informed the other detectives that he had done so.

Meanwhile, appellant drove to the parking lot of a nearby Giant Food store, pulled the Beretta into a parking space next to a blue Chevrolet station wagon, got out of the Beretta, lifted up the hood, and stood in front of the Beretta. At this point the occupant of the station wagon, later identified as Mark Lambert, got out of that vehicle and spoke with appellant for about one minute. Appellant then closed the hood of his vehicle and drove off. Mr. Lambert returned to his vehicle and drove off. Sergeant Conaboy followed the Beretta and Detective Griffin followed the station wagon.

Appellant pulled into an Exxon gas station. Mr. Lambert then pulled into the gas station, got out of the station wagon, looked in the direction of the Beretta, walked into the convenience store section of the gas station, and remained in the store for about five minutes. He then returned to his vehicle and drove away. After following Mr. Lambert for a short distance, the officers decided to effect a traffic stop. Mr. Lambert, however, did not stop immediately and threw an object out of his vehicle before he came to a stop. Approximately 500 feet from where Lambert's vehicle came to a stop, the officers discovered a white ziplock baggie containing a substance later tested and found to be crack cocaine. The officers arrested Mr. Lambert and advised him of his *Miranda* rights. At this point, Mr. Lambert told the officers that he had bought a rock of crack cocaine from the individual in the red Beretta. The officers radioed this information to Sergeant Conaboy, and requested that he arrest appellant.

Sergeant Conaboy's role in the surveillance operation was to "stop and apprehend" the individual that the police suspected of dealing drugs, and he picked up the surveillance of the Beretta as it left the Giant Food store. When appellant pulled into the Exxon station and stopped abruptly on the side of the Exxon lot, Sergeant Conaboy pulled in behind the Beretta, activated his emergency equipment, and "pinched the door, in essence, came up behind it and put [the] bumper [of his vehicle] right up towards the door of [appellant's] vehicle." He then walked up to the Beretta, identified himself, and told appellant to keep his hands up on the steering wheel and not

to move them. He also ordered appellant to produce a driver's license and vehicle registration.

Sergeant Conaboy told appellant that he had reason to believe that appellant was selling drugs in the area, and that other detectives were in the process of following and stopping subjects whom they believed had just purchased drugs from appellant. Sergeant Conaboy also stated that, in a moment or two he would make a determination as to what to do with appellant and that in the meantime they would sit and wait. Sergeant Conaboy did not recall whether appellant asked if he was free to leave the scene, but stated that if appellant had asked to leave, he would not have been permitted to do so. At the point in time when he stopped appellant, Sergeant Conaboy had not been told that drugs were recovered from any of the other vehicles under surveillance that evening.

Approximately five to ten minutes after Sergeant Conaboy detained appellant, he learned from his colleagues that Mr. Lambert had been placed under arrest. At this point, he placed appellant under arrest and conducted a search incident to the arrest. That search turned up a loaded nine-millimeter handgun in appellant's left jacket pocket, and cocaine in appellant's left interior breast pocket.

### Discussion

### I

According to appellant, his motion for suppression of the items seized from his person should have been granted because (1) Sergeant Conaboy's detention of appellant was an "arrest" rather than an "investigatory stop," and (2) appellant's suspicious behavior did not establish probable cause for an arrest. We disagree.

### A. Investigatory Stop v. Arrest

Appellant contends that he was arrested because he was not free to leave.[3] It is true that, once appellant was told

___

3. Indeed, appellant was not free to leave. Had he been free to leave, this would have been a mere accosting for which reasonable suspicion

to put his hands on the steering wheel of his vehicle, appellant was not free to leave. That fact alone, however, does not establish that appellant was "arrested." *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A *Terry* stop is distinguishable from an arrest in three important respects: the length of the detention, the investigative activities that occur during the detention, and the question of whether the suspect is removed from the place of the stop to another location. *Farrow v. State,* 68 Md.App. 519, 526, 514 A.2d 35 (1986) (*citing Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). "In determining whether an investigatory stop is in actuality an arrest requiring probable cause, courts consider the 'totality of the circumstances.' " *In re David S.,* 367 Md. 523, 535, 789 A.2d 607 (2002) (quoting *United States v. Patterson,* 648 F.2d 625, 632 (9th Cir.1981)). Under the totality of circumstances, no one factor is dispositive. *See Ferris v. State,* 355 Md. 356, 376, 735 A.2d 491 (1999).

Appellant argues that, under the totality of the circumstances, he was arrested without probable cause. From our review of the totality of circumstances, we are persuaded that the stop in this case was a *Terry* stop, not an arrest. Appellant's detention was brief, and he was not removed from the location at which he was detained. Under the circumstances, appellant's detention was entirely reasonable.

### 1. The Force (or lack of force) that Accompanied the Stop

Appellant notes that the police cruiser was blocking a door of his vehicle and that he was required to identify himself. In *State v. Rucker,* 374 Md. 199, 821 A.2d 439 (2003), however, the Court of Appeals held that a similar stop did not constitute an arrest:

[The officer] parked his patrol car behind [appellant's vehicle]. There was no vehicle occupying the space in front of

would not have been required. *See Carter v. State,* 143 Md.App. 670, 677, 795 A.2d 790 (2002).

the [appellant's vehicle] at the time. As [the appellant] was getting into the driver's side of the [appellant's vehicle], [the officer] called to him in an attempt to get his attention, walked to him, and requested [the appellant's] license and registration. [Appellant] asked, "what's going on," the [officer] just repeated his original request, and [appellant] subsequently complied. [The officer] was uniformed and armed, but his weapon was not drawn, and he "made no physical contact with [appellant]."

*Id.* at 204, 821 A.2d 439 (holding that the forceable stop at issue was an "investigatory stop" rather than an "arrest").

Citing *Morton v. State*, 284 Md. 526, 397 A.2d 1385 (1979), appellant argues that he was arrested when Officer Conaboy instructed him to keep his hands on the steering wheel and not to move them. The *Morton* Court held, however, that the suspect was arrested when the officers removed him from a recreation center and **placed him in a patrol car.** *Id.* at 530, 397 A.2d 1385. In *Lee v. State*, 311 Md. 642, 665–66, 537 A.2d 235 (1988), the Court of Appeals held that ordering individuals to lay down on a basketball court did not transform an investigative stop into an arrest. In *David S., supra,* the Court of Appeals held that the acts of handcuffing an individual and placing him on the ground for a brief time does not automatically convert an investigatory stop into an arrest. 367 Md. at 539, 789 A.2d 607.

Until Sergeant Conaboy received information that appellant had been implicated by Mr. Lambert, appellant was neither removed from his car nor physically restrained in any way. The "degree of force" factor indicates that appellant was the subject of an investigatory stop rather than an arrest.

## 2. Length of Detention

Appellant argues that the five to ten minute period of time when he was required to remain in his car exceeded the scope of an investigatory stop. Appellant also argues that the stop amounted to an arrest because (1) "hypothetically" the stop could have lasted much longer, and (2) he would not have been allowed to leave even had he requested to do so.

We decline to speculate about what "hypothetically" could have happened, and shall confine our analysis to the facts in the hearing record. Appellant was stopped for no longer than ten minutes while Sergeant Conaboy waited for a report on the status of Mr. Lambert and the other suspected buyers with whom appellant had been observed.

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (citing *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868). The method of investigation in this case was not unreasonable considering the series of events leading up to the stop. Appellant was observed engaging in very suspicious activities at a variety of locations. Sergeant Conaboy stopped him only long enough to find out whether Mr. Lambert, who had just been observed meeting with appellant, had any relevant information. It was reasonable to detain appellant for a brief period of time, thereby ensuring that appellant would not escape. When Mr. Lambert told the police that appellant had just sold him drugs, appellant was immediately arrested. The entire incident lasted less than ten minutes.[4]

## B. Validity of the Investigatory Stop

### 1. Reasonable Articulable Suspicion

■ Appellant argues in the alternative that, even if the seizure was a *Terry* stop rather than an arrest, there was no reasonable articulable suspicion to support it.

---

4. When justified by the circumstances, courts have approved flexible police responses to the problems of a *Terry* stop. *See U.S. v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In *Carter v. State*, 143 Md.App. 670, 795 A.2d 790 (2002), this Court determined that, based on the purpose of a stop, the summoning of a drug-sniffing canine was "a means of investigation that was likely to confirm or dispel the suspicions quickly" and that the thirty-eight minute stop in that case was not unreasonable. *Id.* at 674, 795 A.2d 790.

■ The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is clear, however, that "the Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). In *Terry*, the Supreme Court held that a police officer may stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion, supported by articulable facts, that criminal activity "may be afoot." 392 U.S. at 30, 88 S.Ct. 1868; *see also Quince v. State*, 319 Md. 430, 572 A.2d 1086 (1990).

■ The "reasonable suspicion" standard has been defined as nothing more than "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). While the reasonable suspicion standard is more than a "hunch," it "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In evaluating the existence of reasonable suspicion, courts consider "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Furthermore, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673.

The stop and frisk in *Terry* took place after an experienced officer observed three men repeatedly pacing back and forth along a short stretch of the street, pausing each time to look into a particular store window. Suspicious that the men were preparing to rob the store, and concerned that they were armed, the officer confronted them and patted down their outer clothing. It turned out that each was in fact armed. The *Terry* Court held that the stop was reasonable and that

the evidence acquired as a result of the pat down was admissible. The officers had observed a series of acts, "each of them perhaps innocent in itself, but which taken together warranted further investigation." *Terry*, 392 U.S. at 22, 88 S.Ct. 1868.

In the case of *David S., supra*, a police officer observed the respondent and his companion approach an abandoned building. When he saw the companion crouch down in front of the building while the respondent went behind the building, the officer made an investigative stop. 367 Md. at 534–35, 789 A.2d 607. The Court of Appeals held that, under these circumstances, the officer had reasonable articulable suspicion that the respondent and his companion were engaging in criminal activity. *Id.* On the other hand, in *Ransome v. State*, 373 Md. 99, 816 A.2d 901 (2003), a majority of the Court of Appeals held that a police officer did not possess the requisite reasonable suspicion to stop and frisk Ransome based only on the fact that Ransome was in a high-crime area and had a bulge in his pocket.

"Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are common-sense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (citations omitted). Officers are permitted and encouraged to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citations omitted).

We agree with Judge Hennegan that the evidence presented at the suppression hearing justified a *Terry* stop. The police had observed very suspicious behavior and were able to enunciate facts that established a reasonable articulable suspicion that appellant sold drugs to two customers. "A factor that, by

itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Ransome*, 373 Md. at 105, 816 A.2d 901. This series of events, when viewed collectively, established the validity of appellant's initial seizure.

## 2. Detention v. Detentions

Appellant also argues that there were two separate seizures, the first of which occurred when he was instructed to place his hands on top of the steering wheel, and the second of which occurred when he was required to remain in that position for the five to ten minute period of time before he was ordered out of his vehicle. Once the purpose of an investigatory stop has been fulfilled, the continued detention of an individual amounts to a second detention. 460 U.S. at 500, 103 S.Ct. 1319. We must therefore determine whether the stop was longer than necessary to effectuate its purpose.

Judge Hennegan found that

the sergeant was telling [appellant] why he stopped him and checked his license and registration, and then sat and waited for information, which is similar probably to a traffic check, to see if there are any warrants or hits out for the Defendant. . . . I think five to ten minutes is not an unreasonable period of time for further investigation under these circumstances because they knew that Lambert was going to be stopped very shortly and just right up the road, and to let him go would probably result in destruction of evidence.

We agree with that analysis. Sergeant Conaboy stopped appellant after the team of surveillance officers observed suspected drug transactions involving appellant and the other individuals under surveillance. The sergeant approached appellant, requested identification, and told appellant that in moments, after a brief investigation, appellant would know his status. Sergeant Conaboy was awaiting communication with

the other arresting officers to confirm Mr. Lambert had just bought drugs from appellant.[5] Upon receiving confirmation, Sergeant Conaboy immediately arrested appellant. The entire incident from the beginning of the stop to the formal arrest lasted no longer than ten minutes.

It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained but the officer may also or instead conduct a non-search examination of the suspect's person, car, or objects he is carrying, or may compare the suspect's shoes with prints at the nearby crime scene. . . . Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered, to determine if certain property in possession of the suspect has been stolen, or to confirm the identification or determine whether a person of that identity is otherwise wanted. **Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises or vehicles, locating and examining objects abandoned by the suspect or otherwise lawfully discovered, or talking with other people. . . .**

---

**5.** In *Carter v. State, supra,* 143 Md.App. 670, 795 A.2d 790, this Court approved of a thirty-eight minute investigatory stop during which the police waited twenty-five minutes for the arrival of a drug-sniffing canine. This Court has also held that an officer's actions were reasonable when, upon learning of the existence of an outstanding warrant, the officer arrested the person who had been stopped twelve minutes after the initial stop. *Trott v. State,* 138 Md.App. 89, 117, 770 A.2d 1045 (2001). In contrast, this Court held a forty-five minute detention to be excessive in *Alfred v. State,* 61 Md.App. 647, 487 A.2d 1228 (1985). "It is not the lapse of time, *per se,* that makes it [excessive]. If some legitimate purpose were being served by a necessary wait, our conclusion might be otherwise. . . . They [the police] were simply waiting for the detainees, resistance worn down, to change their stories and confess." *Id.* at 663, 487 A.2d 1228.

Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment*, § 9.2(f) at 51–58 (1996)(footnotes omitted)(emphasis added).

This Court has noted in the past that a brief detention in order to check for open warrants on a suspect is a legitimate investigatory technique in the course of a *Terry* stop. *Brown v. State*, 124 Md.App. 183, 193, 720 A.2d 1270 (1998)(citing *Flores v. State*, 120 Md.App. 171, 706 A.2d 628 (1998)). "The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500, 103 S.Ct. 1319.

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

*United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (citations omitted)(approving a twenty minute *Terry* stop).

The brief period of time that appellant was detained in this case was not unreasonable. A legitimate purpose was served by holding appellant for a brief period of time while Sergeant Conaboy's fellow officers determined whether appellant had sold drugs to the other persons under surveillance. In light of the purpose of the stop, and the length of time between the stop and the point at which Sergeant Conaboy learned that Lambert had indeed purchased drugs from appellant, we are persuaded that only one investigatory stop occurred.

## II

 Appellant argues that the evidence was insufficient to support his conviction for use of a firearm in relation to drug trafficking.[6] According to appellant, there was insufficient evidence to establish the requisite *nexus* between the loaded nine-millimeter and the drug trafficking because he never "used" the gun during and in relation to the drug trafficking offense.

The crime of use of a firearm in relation to drug trafficking, formerly codified at Md. Ann.Code, art. 27, § 281A (1957, 1996 Repl.Vol.),[7] is defined as follows: "(b) During and in relation to any drug trafficking crime, a person who possesses a firearm under sufficient circumstances to constitute a nexus to the drug trafficking crime or who uses, wears, carries, or transports a firearm is guilty of a separate felony...." Section 281A(b) was enacted in 1989 as part of the Drug Kingpin Act, the purpose of which was to reduce the supply of drugs in Maryland by establishing harsher penalties for drug dealers and by decreasing the profitability of participation in a drug

---

**6.** The standard for our review of the sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bloodsworth v. State*, 307 Md. 164, 167, 512 A.2d 1056 (1986)(citing *Jackson v. Virginia*, 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). This standard applies to all criminal cases, including those resting upon circumstantial evidence, *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992), since, generally, "proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts," *Eiland v. State*, 92 Md.App. 56, 67, 607 A.2d 42 (1992), *rev'd on other grounds sub nom., Tyler v. State*, 330 Md. 261, 623 A.2d 648 (1993). Circumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused. *Finke v. State*, 56 Md.App. 450, 468–78, 468 A.2d 353 (1983), *cert. denied*, 299 Md. 425, 474 A.2d 218, *and cert. denied*, 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984).

**7.** Now codified at Md Code Ann , Crim. § 5–621 (2002).

trafficking crime. *Harris v. State*, 331 Md. 137, 142, 626 A.2d 946 (1993).

In *Harris*,[8] the Court of Appeals reversed a conviction for using a firearm during and in relation to a drug trafficking crime. In that case, however, the conviction was based upon evidence that the defendant and others were found on the first floor of his home, the weapons and drugs were found on the second floor, with the drugs in a hallway closet and the weapons in various rooms. The *Harris* Court held that, under these circumstances, there was no evidence that the defendant "used" the firearms in connection with a drug trafficking offense, and that "use" of a firearm required something more than mere possession of a firearm. *Id.* at 157, 626 A.2d 946. "One who uses or wears, carries or transports a firearm during a drug trafficking crime is not guilty of a violation of section 281A(b) unless the evidence also establishes that the use, wearing, carrying or transporting was in relation to that crime." *Id.* at 144–45, 626 A.2d 946. In 1996, in response to *Harris*, the General Assembly amended section 281A(b) by expanding the crime to include a person who "possesses" a firearm in conjunction with a drug trafficking offense.

In *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Supreme Court was faced with an

---

8. In *Rich v. State*, 93 Md.App. 142, 611 A.2d 1034 (1992), this Court upheld a conviction for use of a firearm during and in relation to a drug trafficking crime when the police discovered drugs and several firearms in the defendant's home, along with evidence that the home was being used to conduct a drug-dealing operation. While it was established that Rich possessed the firearms at issue in that case, Rich argued that there was no evidence that she actually "used" the firearms. This Court reasoned that the circumstances indicating "possession" of the firearm were sufficient to indicate "use" of the firearm. *Id.* at 161, 611 A.2d 1034. This Court stated in *Rich*, 93 Md.App. at 159, 611 A.2d 1034:

> [I]t is reasonable, we think, if an operable firearm is found in close proximity to a room or rooms in which drug distribution, processing, or storage occurs, for the factfinder to conclude that the defendant knew the gun was there and intended it to be available for use in connection with the predicate offense.

The Court of Appeals vacated our holding in *Rich* and remanded that case to be reconsidered in light of its holding in *Harris v. State*, 331 Md. 137, 626 A.2d 946 (1993).

early version of a similar statute that prohibited "using or carrying a firearm during and in relation to" drug trafficking.[9] Asked to determine the meaning of the word "use" in that context, the *Bailey* Court held that the government must produce "evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at 143, 116 S.Ct. 501. After *Bailey,* Congress amended 18 U.S.C. § 924(c) to criminalize the "possession" of a firearm "in furtherance of" certain crimes.[10] In so doing, "Congress clearly intended to broaden the reach of the statute in the wake of the Supreme Court's narrow construction." *United States v. Ceballos–Torres,* 218 F.3d 409, 413 (5th Cir.2000).

In *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), the Supreme Court held that the phrase "in relation to" requires that the "firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence.... Instead, the gun at least must 'facilitate or have the potential of facilitating,' the drug trafficking offense." *Id.* at 238, 113 S.Ct. 2050 (citation omitted). In *Ceballos– Torres, supra,* to resolve the issue of whether the weapon possessed by a particular defendant "furthers, advances, or relates to a drug trafficking offense," the Fifth Circuit analyzed "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." According to the appellate court:

---

**9.** 18 U.S.C. § 924(c) (1995).

**10.** Although we analyze this case under Maryland's "in relation to" standard, federal cases involving the previous "in relation to" version of § 924(c) and the present "in furtherance of" version are instructive. In fact, as appellant points out in his brief, according to the Tenth Circuit, the possession "in furtherance of" standard of § 924(c)(1) is actually a slightly higher standard than the "in relation to" standard. *See United States v. Iiland,* 254 F.3d 1264, 1272 (10th Cir.2001).

These factors help distinguish different types of firearm possession. For example, a drug dealer whose only firearms are unloaded antiques mounted on the wall does not possess those firearms "in furtherance" of drug trafficking. Nor will a drug trafficker who engages in target shooting or in hunting game likely violate the law by keeping a pistol for that purpose that is otherwise locked and inaccessible.

*Id.* at 414–15.

In *Ceballos–Torres,* the firearm was loaded and easily accessible in Ceballos's apartment, and he confessed that it was his. It was possessed, illegally, in the apartment along with a substantial amount of drugs and money. The appellate court held that this evidence was legally sufficient. *Id.* at 415.

[A]n accessible gun provides defense against anyone who may attempt to rob the trafficker of his drugs or drug profits. [P]ossessing a gun, and letting everyone know that you are armed, lessens the chances that a robbery will even be attempted. [H]aving a gun accessible during a transaction provides protection in case a drug deal ... turns sour.... Carrying a firearm always serves to protect the holder.

*Id.* at 412–13.

The Tenth Circuit presumes a nexus between a firearm and a drug trafficking offense when an individual with ready access to a firearm commits such an offense. *See United States v. McKissick,* 204 F.3d 1282, 1293 (10th Cir.2000). The Third Circuit has concluded that, "when a defendant has a loaded gun on his person while caught in the midst of a crime that involves in-person transactions, whether involving drugs or not, a[ ] judge can reasonably infer that there is a relationship between the gun and the offense...." *United States v. Loney,* 219 F.3d 281, 288 (3rd Cir.2000). In *United States v. Molina,* 102 F.3d 928, 932 (7th Cir.1996), the appellate court held that "if the drugs and the gun are together in the same place it is nearly an inescapable conclusion that they satisfy the *in relation to* prong of section 924(c)(1)." In *United States v. Luciano,* 329 F.3d 1, 6 (1st Cir.2003), the First

Circuit held that the evidence was sufficient to convict the defendant under section 924(c) of possession of a gun "in furtherance of" a drug trafficking crime when both drugs and firearms were found in a crawl space of his house.

■■■ It is now well settled that the trier of fact is entitled to find that when (1) drugs are discovered under circumstances that indicate the person possessing those drugs intended to distribute them, and (2) a gun is discovered in close proximity to the drugs, the gun was possessed "in relation to" a drug trafficking crime. When appellant was arrested, he was in possession of a loaded nine-millimeter handgun in the left pocket of his jacket, and a ziplock baggie containing two ziplock baggies of crack cocaine in his left interior breast pocket. In addition, Judge Hennegan found that, just prior to being stopped, appellant had been selling crack cocaine. These facts are sufficient to prove that appellant was using, wearing, carrying, and/or transporting a firearm during and in relation to a drug trafficking crime.

## III

Appellant received a five-year sentence for use of a firearm in relation to drug trafficking, and a two-year (concurrent) sentence for the unlawful wearing, carrying, or transporting of a handgun. He argues that Judge Hennegan should have merged the "unlawful wearing" conviction into the "use" conviction. According to appellant, he should not have been sentenced for both offenses.

The first statutory offense at issue in this case is the unlawful wearing and carrying of a handgun. Formerly codified at Md. Ann.Code, art. 27, § 36B (1957, 1996 Repl.Vol.),[11] the statute proscribes the wearing, carrying, or transporting of handguns, whether concealed or open, upon or about the person, or knowingly transporting a handgun in a vehicle. The second statutory offense is section 281A(b), the use of a weapon during a drug trafficking crime.

---

11. Now codified at Md.Code, Crim § 4–203 (2002).

**310**

In *Brooks v. State,* 284 Md. 416, 420–21, 397 A.2d 596 (1979), the Court of Appeals held that the "required evidence test" is the general standard for determining whether one criminal offense merges into another.[12] Under this test, the violations are separate if "[e]ach of the offenses created requires proof of a different element." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). However, "[t]he imposition of multiple punishment ... is often particularly dependent upon the intent of the Legislature." *Whack v. State,* 288 Md. 137, 143, 416 A.2d 265 (1980). Even if merger is not required under the required evidence test, the Legislature may not intend that separate sentences be imposed for two offenses growing out of the same transaction. *Brooks,* 284 Md. at 423, 397 A.2d 596. On the other hand, "even if offenses [are] deemed the same under the required evidence test, the Legislature may punish certain conduct more severely if particular aggravating circumstances are present, by imposing punishment under two separate statutory offenses." *See Newton v. State,* 280 Md. 260, 274 n. 4, 373 A.2d 262 (1977).

In *Whack,* the Court of Appeals held that separate sentences may be imposed for robbery with a deadly weapon and use of a handgun in the commission of that felony, even though both convictions were based upon a single act of robbery with a handgun. *Id.* at 149, 416 A.2d 265. The *Whack* Court noted that, when the handgun control statute was enacted, "the Legislature specifically addressed the matter of other statutes encompassing handguns and it indicated its intent as to which of those other statutes should no longer cover the use of handguns ... Where [the Legislature] desired no duplication it specifically amended or superseded those other statutes." *Id.* at 145–46, 416 A.2d 265. Section 488, however, was not amended or superseded. Nor was section 281A(b). In *Frazier v. State,* 318 Md. 597, 569 A.2d

---

**12.** Originally set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and also referred to as the *Blockburger* test.

684 (1990), the Court of Appeals refused to order the merger of sentences imposed for convictions of (1) wearing, carrying, or transporting a handgun and (2) possessing a pistol or revolver by a person who has been convicted of a crime of violence. According to the *Frazier* Court, "it is plain that the Legislature did not intend to prohibit separate penalties for violation of the two statutes." *Id.* at 615, 569 A.2d 684.

 Appellant's convictions under sections 281A(b) and 36B do not merge under either the required evidence test or as a result of legislative intent. First, each requires proof of a separate element. Section 281A(b) requires that a weapon be used during and in relation to a drug trafficking crime and section 36B requires the use of a handgun. These are separate and distinct elements of separate and distinct crimes. Second, the statutory language and legislative history unambiguously imposes separate penalties. Concerned with the increased use of handguns in the commission of crimes, the Legislature enacted the handgun control statute in 1972,[13] and announced its policy in section 36B(a):

(a) *Declaration of policy.* The General Assembly of Maryland hereby finds and declares that:

(i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns;

(ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity;

(iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and

(iv) further regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace

---

13. MD. ANN.CODE, art. 27, §§ 36B–36F (1972).

and tranquility of the State and to protect the rights and liberties of its citizens.

In furtherance of that policy, the Legislature declared:

Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor....

▮ Appellant also urges this Court to apply the rule of lenity. The rule of lenity, however, applies only when criminal statutes are ambiguous. There is no ambiguity in these statutes. The Legislature's concern about the use and possession of handguns, and its additional concern about the aggravating circumstance of weapons being used by persons transacting in drugs, is apparent. Because we are persuaded that the Legislature intended to authorize the imposition of a separate punishment for each of the offenses at issue, Judge Hennegan did not err or abuse his discretion when he refused to merge appellant's "unlawful wearing" and "use" convictions for purposes of sentencing.

**JUDGMENTS AFFIRMED;**

**APPELLANT TO PAY THE COSTS.**